STATE v. GOODE.

(Filed April 8, 1902.)

ASSAULT AND BATTERY—*Excessive Force—Questions for Jury—Evidence.*

Whether a person, indicted for an assault and battery, used excessive force is a question for the jury.

INDICTMENT against Lucinda Goode, heard by Judge W. S. O'B. Robinson, at September Term, 1901, of the Superior Court of WAKE County. From a verdict of guilty and judgment thereon, the defendant appealed.

The prosecuting witness, a white man, went to the house of defendant, an old colored woman, to collect some money on furniture which had been sold to her husband on the installment plan. She invited him into her house and to take a seat; he told his errand. She said she could not pay, and his testimony is that he went to examine the bedstead, when the defendant batted him on the back of his head with a baseball bat. On cross-examination, he said he had removed a covering or two from the bed when he was hit with the bat, but that he had done this only to see if the bed was in good condition.

The defendant testified in her own behalf that the prosecutor, accompanied by a negro man, drove up to the sidewalk in front of her house, backed the wagon up to the ditch, and both of them got out and came in the porch; both were strangers to her. She invited the prosecutor in and gave him a seat in her rocking-chair, his companion taking a seat on the porch. The prosecutor said he had come for the bedstead or the money for it. She replied that she did not have the money then, and asked him to wait until her husband came. The prosecutor jumped up out of the chair swearing, said he had to have his money then or he would take the bedstead out of there or die and go to hell trying. He then walked around the table where she was ironing and went to

the head of the bed and took a table-cloth that was lying on the bed and threw it on the floor. She told him to go out of her house and to wait till her husband came, and not to take any more things off that bed. He again swore, and said he was going to take that bedstead out or die and go to hell trying, and he then took up an underskirt that was lying on the bed and threw it down on the floor and began to throw back the covering. She again told him to go out of her house and let her things alone, and he kept on throwing back the covering and started to throw back the mattress, and as he started to do this she picked up a small baseball bat that her boy played with, and walked up to the bed and said, "Let my things alone"; and as she did this, he turned sideways at her and drew back his fist and said, "You must be a damned fool," and she hit him with the bat.

Being asked the question why she hit the prosecutor with the bat, she said, "Because he would not let my things alone and go on out of my house." She was corroborated by several other witnesses. His Honor, upon the above evidence, charged the jury that the defendant was, upon her own testimony, guilty of using excessive force upon the prosecuting witness, and instructed the jury to find the defendant guilty. Verdict accordingly. Defendant excepted to the charge. The Court sentenced the defendant to thirty days in the workhouse.

*Robert D. Gilmer, Attorney-General,* and *J. C. L. Harris,* for the State.

*W. L. Watson,* for the defendant.

CLARK, J. Whether there was excessive force used or not was a question for the jury, not for the Court. The defendant's testimony was fuller than that of the prosecutor, but was not contradicted by him, and taking it to be true, as his Honor assumed, and as must be done on the virtual demur-

rer to her evidence, these are the facts:    Two strangers, one
of them a white man, came to the defendant's home; she in-
vited the latter in politely, and gives him her rocking-chair;
without showing any credentials, he demands pay for her
bedstead; upon her saying she had no money and asking him
to wait till her husband came, the prosecutor jumps up vio-
lently, and swearing he would take the bedstead or go to hell
trying, he throws her table-cloth and underskirt on the floor.
She tells him to let her things alone.    As she was ironing,
presumably those things were freshly washed and nicely
starched and ironed, and he must have known that to throw
them on the floor would rouse her ire.    Then he laid his pro-
fane hands on the paraphernalia of her bed and began to
throw back the bed clothes and to lift the mattress, all of
which would speedily have gone, of course, upon the floor.
The defendant would not have been a woman if she had stood
that.    She seized her little boy's baseball bat and told him to
let her things alone and leave the house, when he squared off
at her, drawing back his fist, and called her "a damned fool,"
whereupon very naturally she batted the back of his head.
It was probably a "left-fielder," for the prosecutor soon after
left that field.    The counsel for the prosecutor tells us he left
because he did not wish to provoke a difficulty.    It is doubt-
ful if he could do more to provoke a woman, which is some-
times worse, and it would seem that he left rather than to
collect another installment on the batting.

The woman was in her own house.    If her evidence is true,
and it must be so taken on this appeal, she treated the prose-
cutor politely, and he returned her politeness by swearing,
throwing her things on the floor, throwing back the bed
clothes and mattress, and avowing his intention to carry off
her bedstead, at the direst hazard to his soul, and drawing
back his fist at her, and cursing her when again told to desist.
It can not be said, as a matter of law, with two men against
her, and in her own house, she used excessive force in pro-

tecting her person, her home and her property. In view of his violent conduct and language, and refusal to behave or to leave, could she have secured her rights in her own home or his departure by the use of less force? Could she with safety to her person have laid hands on him more gently? If, on another trial, the evidence being the same, it shall be held that this was excessive force, a jury must so declare it. This Court can not.

Sir Edward Coke (3 Inst., 162) says: "A man's house is his castle, *et domus sua cuique tutissimum refugium,*" which last is a literal quotation by him from the famous *Corpus Juris Civilis* of Justinian, and is to be found in the Pandects, lib. II, tit. IV, *De in Jus Vocando.* And another great lawyer and statesman, whose name is borne with honor by two of our counties, William Pitt, Earl of Chatham, used this ever memorable expression: "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storms may enter; the rain may enter—but the King of England can not enter. All his forces dare not pass the threshold of the ruined tenement." The old colored woman knew naught of legal lore, but she had an instinctive sense of her rights, and, by means of the wooden wand touched to the back of witness' head, she communicated electrically to his brain the same conception more effectually than if she had read to him the above citations.

This home was an humble one; the bedstead on which defendant slept may not have been fully paid for, but the prosecutor had no right to enter that home and misbehave, or refuse to leave when ordered out, still less to carry off any property therefrom, unless he had been an officer with a legal precept so to do, and the occupant of that home had the right to use sufficient force to make him leave and to abandon his attempt to carry off the bedstead, and to stop his handling of the other

property—in short, to make him "leave her things alone," as the defendant repeatedly told him to do.

Whether the force used by the defendant was excessive is matter for a jury. Indeed, if this evidence is to be believed, the prosecutor was a law-breaker, and is himself in jeopardy of the judgment for his violence and his defiant disregard of the rights of the defendant. Suppose this defendant had been white, and the prosecutor a negro man. The law is impartial, and extends the same protection to all alike.

Error.