### STATE v. BLACKLEY.

(Filed October 28, 1902.)

ESCAPE—*Evidence—Sufficiency—Questions for Jury—The Code,*
*Sec. 1022.*

> In an indictment for an escape, there being evidence that the
> officer tried in good faith to prevent it, the questions of good
> faith and diligence of the officer are matters for the jury.

INDICTMENT against F. M. Blackley, heard by Judge *Thos.
J. Shaw* and a jury, at November Term, 1901, of the Supe-
rior Court of GRANVILLE County. From a verdict of guilty
and judgment thereon, the defendant appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*Royster & Hobgood,* and *J. W. Graham,* for the defendant.

FURCHES, C. J. This was an indictment for an escape,
under section 1022 of The Code. The defendant was a con-
stable in Granville County, and one Rogers was put in his
custody with a mittimus from the Justices of the Peace who
had investigated the case against Rogers, upon a warrant
charging him with rape. The facts, that the defendant was
a constable; that Rogers was tried upon a warrant charging
him with rape; that sufficient cause was found to commit
him to jail, and that he was committed to the custody of the
defendant, with a mittimus, were shown in evidence, and
are not denied. This made a *prima facie* case of guilt against
the defendant, under section 1022 of The Code, and threw
the burden on the defendant of showing that he was not
guilty. The statute itself provides that, after the *prima
facie* case is made out, "it shall then lie upon the defendant
to show that such escape was not by his consent or negligence,
but that he used all legal means to prevent the same, and
acted with proper care and diligence."

The defendant, for the purpose of showing that he was not guilty, went upon the witness stand in his own behalf, and testified as follows:

"Rogers 'was committed to my custody by the Justices of the Peace about eight o'clock in the evening. I took him to Lyon's store, and the Justices wrote out mittimus and handed it to me. C. H. Parham came to me at the store, and said there was a crowd coming out from Oxford to lynch Rogers, and I heard this from several other parties, Pete Kearney, Phil. White, Tom Mitchell, and others whose names I do not recall, told me so. There had been several lynchings in Granville County. I had no buggy at the place of trial. I lived two miles from there by the road, but one and a quarter miles by path. When I heard these rumors about the lynching, I took Rogers and Phil. White, and when I got into the woods I told Phil. White to go and summon some men and arm them, and to bring them on to my house, and that we would do something to protect this man. I arrested Rogers on the Saturday before, and this was on Tuesday night. I had had him in custody from then until the trial. I did not put him in the jail. The Justices of the Peace told me to keep him in my custody until Tuesday, when the trial was had. I did keep him in my custody, and he made no attempt and showed no disposition to escape. After I sent Phil. White back, I went on to Mr. Dement's house and woke him up and summoned him to help me. I then went on to my own house and saw Ed. Blackley, who is no kin to me but about twelfth or thirteenth cousin, and works at my place, and summoned him as a guard. I carried the prisoner to my house, but did not keep him there on account of my wife's condition. She was nervous and delicate—had been an invalid for two years. I went from my house first to the corn field, and the dew was so heavy that Mr. Dement suggested that we go back into the old field. Ed. Blackley went after

our supper and brought it, and after we had eaten it, we agreed to carry Rogers a mile away. It was pretty quick after supper that I saw a crowd coming. It was bright moonlight, and they were in their shirt sleeves. They shot four or five times when they were about as far as across the court house from me, and kept coming and started shooting again, and as they shot again, I ran, and shot behind me. I ran into the cotton patch, and Rogers was right with me. They caught me, and Rogers fell into the ditch. I told them they ought to give the man a fair trial, and ought not to take him and butcher him up. They took Rogers off while some of them held me down, and cursed me, and said if I didn't hold my mouth they would kill me. There were twelve or fifteen in the crowd; they held me three or four minutes. There were handkerchiefs over their faces. I do not know who they were. While they had me down, they shot two or three times. Sam. Ball's people lived thirty-five or forty yards from there, and they heard it. I told them to get off of me and not to do this thing. I tried to make them turn Rogers loose. They cursed me. I was saying nothing while running. Dement and Blackley were with me when we started to run. Dement stopped, and Blackley stopped in corn field. I was in front of both of them. I had heard nothing of Rogers' friends trying to rescue him. I had no reason to believe they would."

On cross-examination, this witness testified:

"I have been constable three years. I drink something, but never drank when I have business to attend to. Rogers did not have pistol while in my custody. I will not say he did not have pistol on the trial, because I had nothing to do with him after I turned him over to the Justices of the Peace. After turned him over to them, he went to the store, and I did not watch him. I did carry him to see his sweetheart on Saturday night before the trial. He was my

friend; I did not handcuff him; did not tie him. I never tie white men. Only one man went with me and prisoner from Wilton. There were one hundred representative men there when I left the store, and I could have deputized them to assist me. I deputized Philip White across the road. I heard it from a dozen men that Rogers was to be lynched. Two of his brothers and his friends were there. He had a heap of friends there. I went away from there across the road into a thick body of woods with but one man, and I honestly thought there was a crowd coming to mob him. Phil. White is not kin to me. I based my judgment on the information given me by Parham. Parham was drinking some. He has been in Court. Did not hear Judge Graham say report as to lynching by people from Oxford was false. I knew he was to be tried that evening, and did not bring my horse because I was driving his horse to my buggy. I had sent my buggy home the evening before, but did not send Rogers' horse. Some one rode my horse up there and I sent him home to be fed as they went into trial. After I heard report of lynching, I decided not to bring him to Oxford that night. I did not hear report until after he was committed to me. As soon as I got the mittimus, I carried him off. I had not formed the opinion not to carry him to Oxford when I sent my horse and buggy home. I did not say to the crowd at the trial, 'Stand back; this man is not going to jail.' I did not get hurt at the shooting, nor was my skin bruised or hurt anywhere. There are three different roads from Wilton to Oxford. Sheriff Fleming was at trial during the afternoon. Excitement was pretty high after he was found guilty. I did not believe they would find Rogers guilty. I had reason to believe there would be trouble. I did not ask Sheriff Fleming to stay and assist me. After the trial was over, it was dark. I knew of ten or twelve buggies leaving there and coming to Oxford. I did not consult Graham, Hobgood, or

any of the Justices as to how I should care for the prisoner.
Four or five representative citizens from Oxford were there.
I did not take Rogers to my house to spend the night. I
knew my wife's condition before I took him there. I made
up my mind to go by way of Franklinton and come to Oxford.
When I left Wilton, Rogers' brothers and friends could have
seen us if they had looked. There were thick woods there,
into which we went. I did not tell my wife where we were
going. We were one-fourth mile from road, and the night
was quiet and still. We were in the old pine field as far as
from here to the door from the path. They walked down
the path and stepped back and commenced shooting. They
hit no one, though they shot twelve or fifteen times. They
found me about half past nine o'clock. I did not regard this
as a safe place to stay all night, but regarded it as safest
place. We had just eaten supper, but had not had time to
get away. I do not know how they knew where we were,
unless some one watched us. My wife did not know where
I was. I ran before firing a shot. I had a pistol with five
loads in it. No. 38-calibre. As I ran I shot behind me. I
have not seen Rogers since they took him away from me that
night. I know everybody in that community. Only four
of the crowd came close to me. The others did not
get in ten steps of me. There were three of us and
prisoner. Rogers had a pistol. I did not know he had one
until he commenced firing. I did not search him that day.
I heard since the trial that he had one on the trial. I was
afraid he was going to be lynched, and we all talked about his
going to be lynched. I reckon all those with me had guns.
I did not try to hit any one, and no one on either side got
hurt, so far as I ever heard of."

On re-direct examination:

"I was arrested day before yesterday in this case. I was
not bound over to Court. I was summoning witnesses for

Sheriff, and was out all night. During the trial at Wilton, I was walking about and trying to keep the crowd off the law-yers anad magistrates. I sent my horse home about four o'clock in the afternoon. When the Justices put Rogers in my custody on Friday, they told me I could take him and go around with him to see his witnesses and his lawyers, and I could keep him with me. From the time he was arrested and placed in my custody up to the time of the trial, he was never out of my presence. I slept with him every night."

At the close of the defendant's evidence, the Court in-formed the defendant's counsel that if the defendant's evi-dence was believed, he was guilty, and the Court so charged the jury. Defendant excepted; verdict of guilty; judgment and appeal by defendant.

In this there was error. The statute, The Code, 1022, provides that the defendant may "show that such escape was not by his consent or negligence, but that he had used all legal means to prevent the same, and acted with proper care and diligence." The defendant swears that the escape was not with his consent, and that he acted in good faith in trying to prevent it. He testifies that he was told by a number of per-sons that a crowd was coming from Oxford to lynch the pris-oner; it was then night, and, to avoid the lynchers, he con-cluded not to carry Rogers to Oxford that night, but to con-ceal him until morning, and for that purpose he took him into a dark wood. There was great excitement at the close of the trial, and he did not summons any of the large and excited crowd to assist him, but did summons others after he left the place of trial. But his principal object was to conceal him until morning. There had been several lynchings in Gran-ville County, and he believed the report that a crowd was coming from Oxford to lynch Rogers; and when they were attacked and Rogers taken from him by force, he thought it was the lynchers and he begged them not to lynch him, but to let him have a fair trial.

It was suggested on the argument that what the defendant testified to was not true; that he was playing false; that it was the friends of Rogers who attacked and rescued Rogers for the purpose of liberating him, and not for the purpose of lynching him.    Suppose this was so (and we do not say but what there are circumstances tending to show this to be the case), did the Court have the right to pass upon this fact and say it was so?    Or was it not a matter to be passed upon and found by the jury?

To sustain the judgment of the Court, we would have to hold that the Court had the right to try the fact of good faith, of due diligence, and that he had not used due diligence, or that the defendant was in a conspiracy with the friends of Rogers to release him, and did not believe a mob was coming from Oxford to lynch him, but that story was only a sham and falsehood to cover the fraud of releasing him.    This may all be so, but they were such facts as a jury must pass upon, and not the Court.

It can not be contended that if the defendant acted in good faith; that he believed the report that a crowd was coming from Oxford to lynch Rogers; that for the purpose of preventing this, he concluded to go in hiding and not to carry Rogers to Oxford that night; and that he and those with him were set upon by a masked, armed force, and the prisoner Rogers was captured and taken off, while he was held and ordered to keep quiet under threats of death—that the defendant would be guilty.    And to find that this was not so would be to find that the defendant had sworn falsely.    This the Court had no right to find.    Wherever a question of good faith, or of negligence or reasonable care, or the truth or falsity of a witness' evidence is to be passed upon, it is a matter for the jury and not for the Court.    A Judge can not even weigh the evidence.    *State v. Locke,* 77 N. C., 481.    Where the trial involves a question of intent, it becomes a question

for the jury and not for the Court. *State v. Hopkins,* 130 N. C., 647. It is like finding the felonious intent in a trial for larceny. *State v. Coy,* 119 N. C., 901. Where a party is indicted for an assault and battery, the question of excessive force is a question for the jury and not for the Court. *State v. Goode,* 130 N. C., 651. In the case of *State v. Lewis,* 113 N. C., 622, which was an indictment for escape, the Court held that if the defendant was too sick to give the matter his personal attention, that would excuse him if he had used *due diligence* in selecting his deputy who had the prisoner in charge, and these were questions of fact to be found by the jury. There is error.

New Trial.