[No. 15611. Department Two. April 5, 1920.]

JESSIE E. CROUCH, *Respondent,* v. IRVING W. RINGER
et al., *Appellants.*[1]

ASSAULT AND BATTERY—CIVIL LIABILITY—JUSTIFICATION—EJECTION OF CUSTOMER—WITHDRAWAL OF INVITATION. A market keeper's warning to a customer, who made complaint of fish sold, that her trade was no longer desired and that she could return the fish and receive back her money and not come any more, is withdrawal of the general invitation to enter, except to return the fish, and her removal, using no more force than necessary, when she refused to depart on repeated request, is not actionable as an assault and battery.

Appeal from a judgment of the superior court for King county, Allen, J., entered April 24, 1919, upon findings in favor of the plaintiff, in an action in tort, tried to the court. Reversed.

*Roberts & Skeel,* for appellants.
*Gay & Griffin,* for respondent.

TOLMAN, J.—Respondent, as plaintiff, brought this action against the appellants Ringer and Mueller, as proprietors, and against appellant Pavlik, as manager of the Pacific Meat Company, alleging that, while in the store owned and conducted by appellants, on lawful business, she was assaulted by appellant Pavlik. From a judgment for $200 in favor of respondent and against all three of the appellants, after a trial before the court sitting without a jury, this appeal is prosecuted.

The facts, so far as necessary to be stated here, as we gather them from the record, are substantially as follows: Respondent testified in chief to the effect that she ordered a pound of fish by telephone from appellants' store; that, when her order came, she paid

[1]Reported in 188 Pac. 782.

for it and unwrapped the parcel, and the odor from the fish was such that she did not want it; that she telephoned to the store and said: "The fish is not fresh, I do not want it," and was answered: "All right, bring it back," and that immediately a man's voice sounded over the telephone, and after she had repeated her complaint, he said: "We don't want your trade and you need not come here any more." Respondent thereupon in person went to the store with the fish for the purpose of returning it, gave the fish to the cashier with the remark that it was not fresh, received back the twenty cents she had paid for it, and thereupon the manager, Pavlik, who was standing near, said: "We don't want any more of your trade. We would like to have you keep away from this store." She further testified as follows:

"I didn't say anything for a moment, I was so amazed, and then I said to him that the fish was not fresh, that I had returned it, and that was not any reason to practically order me out of the store, because I had brought it back. I brought it back within practically two hours after he sold it to me. . . . He spoke in a loud, ugly tone and said to me repeatedly, 'You can keep out of this store.' . . . I then said, 'I will not leave this store until I get ready and I will come here to trade if I choose.' I said, 'I have a perfect right to return anything that is not good and this is not good to eat,' and I said, 'I should have sent it to the health department; I regret now that I did not.' He then said, 'If you don't get out of this store I will put you out, I will throw you out.' That was the expression, and I am not accustomed to having any-one speak to me in that way. . . . I stepped toward him then. His voice was loud. Q. Were other people in the store? A. There were not very many people in the store at that time. Q. Were there other people, customers there? A. Yes, there were a few. Q. Go on. A. And I stepped nearer to him, because I spoke quietly, and I said—I told him not to dare to touch

me, not to put his hands on me, that I would not leave the store until I was ready, I had done nothing to be ordered from a place like that, I was never spoken so to in my life. Q. Then what did he do? A. He caught me by both hands and pushed me backwards. One of his hands was covered with the grease from the meat and blood. Q. Where did he grab hold of you. A. On both arms. Q. And did he put you out of the store? A. He didn't push me out of the door. He pushed me back quite a way; I don't know how far. . . . Q. After he pushed you did you go out? A. No, not immediately. Q. Well, did you go out? A. Afterwards I did, yes. Q. How soon afterwards? A. About five minutes afterwards."

Upon cross-examination, respondent further testified:

"His attack upon me certainly occurred in less than ten minutes after I was there, because I refused to leave, I refused to turn and run and I refused to go backward at his order. Q. Yes, you said that you absolutely refused to go out of the store and you absolutely refused to go backward? A. Yes, sir, he had no occasion to do that. Q. And you said here in answer to Judge Gay, 'I would not have stepped back there for anything'? A. And I would not have done it. Q. You say now you would not have stepped back there? A. Yes. Q. And you say now, 'I also stepped toward him'? A. He was speaking in a very loud, ugly tone so that Mr. Keene could hear him, this postman who is a witness, and I stepped near enough to him to speak quietly, because I don't shout and I don't yell; I stepped near enough to him to speak quietly, only for that. . . . Q. When Mr. Pavlik finished his telephone conversation after he had told her to give the lady the money back, didn't he go back through that little aisle and back behind the block and go to work? A. I don't remember exactly that; he was very near me all the time and talking. Q. Yes, because you kept following him? A. No. I didn't keep following him; I stepped toward him to say that I would not be ordered from the store and to say that the fish was not

fresh.   Q. You followed him back there where——
A. No, I did not.   Q. —where no patron of the store or
the public has any right to be, didn't you?   A. No, I
stepped toward the counter; he stepped behind the
counter and I stepped toward it.   Q. I say he went be-
hind the counter and went to his work.   A. I had a
right to step to the counter, did I not?''

Mr. Keene, produced as a witness on the part of re-
spondent, whose testimony bears the impression of
fairness, described what he saw, as follows:

''Q. Now, Mr. Keene, what was it on that day that
first attracted your attention?   A. Well, there was—
when I came in there was rather loud talk, there seemed
to be a kind of mutual misunderstanding among a
couple of them.   Q. Who was it apparently?   A. A
lady and a gentleman.   They were strangers to me.
Q. They were strangers to you?   A. Yes. . . .
Well, I could identify the lady, but I couldn't identify
the man.   The lady was talking very rapidly, and—
Mr. Roberts: The lady, you say, was?   A. Yes, she
was talking rapidly but not very loud.   I didn't under-
stand what she said. . . .   A. I don't remember
anything that the lady said.   He was telling her to
leave the place and not come back, that they didn't
want her trade.   I heard him speak to the cashier and
tell her to return the money.   This has been some time
ago, Mr. Gay, and I don't remember all these things
distinctly.   Q. What did you next hear?   Did she get
her money?   Did you see her get her money appar-
ently?   A. Apparently, yes. I am not positive.   Q. Then
what did you hear, and what took place, and what did
you see?   A. I didn't watch them continuously.   I was
in a hurry and wanted to get an order myself.   The next
that I remember he told her repeatedly to leave the
place, and the next thing that I remember I turned
around and they were just about in this position (indi-
cating) and he had taken her by the arm or shoulder
and shoved her toward—in this direction. . . .
A. Yes, toward the door, but they were about in this
position at that time.   Q. And he shoved her toward
the door.   In what manner did he shove her?   A. Well,

he took her either by the arm or shoulder with his
right hand, this way. He had her by the arm or shoul-
der, and shoved her that way. Q. Was it apparently
in anger, or how, what way? What was his manner
and attitude? A. Oh, yes, he was angry. Q. How was
he talking as to loudness, and the like? A. Well, he
was talking in a rather emphatic, angry tone. Q. Was
it loudness? A. Well, rather loud, yes. Q. How was
she talking? Could you distinguish anything she said,
or was she talking low? A. She was talking low, but
she was talking all the time, and very fast. Q. Talk-
ing all the time? A. And rather excited. Q. Some-
what excited? A. Yes.''

On cross-examination, Mr. Keene testified:

''Q. Now then, the conversation that you heard evi-
dently was at the very beginning, because you say it
was at the time when they told her to give her her
money back? A. Yes. Q. Then Mr. Pavlik went back,
didn't he ? A. Yes, he went back. Q. And she fol-
lowed him down to a point, you say, here about where
you marked, opposite the block there? A. I didn't
watch them continuously. Q. No, but you saw her down
there opposite the block? A. I thought the incident
was closed and he went back. Q. You thought it was
all closed when he went back? A. He walked clear
back around in here (indicating). Q. Yes. A. But
the next time I saw them they were in this position,
right here. . . . A. He himself walked back here
and I thought the incident was closed, and was attend-
ing to my own business, getting my own order up here.
Q. So you don't know where she may have gone in
the meantime, all that you know is that she was here
opposite the north end of that block when that incident
occurred? A. Where I saw it, yes. Q. But he asked
her to leave the store first up here by the counter?
A. Yes. Q. And he asked her several times? A. Yes.
Q. Instead of leaving the store she went back the other
way? A. Yes.''

There was much other testimony relating to the issue
of whether or not respondent had been in the habit of

returning meats previously purchased, and she admits that she had done so on one occasion not long before, and relating also to appellants' version of the affair, and other details not now necessary to be considered, as well as testimony regarding the effect which the episode had on the health of respondent, but enough has been quoted, we think, to show clearly respondent's attitude at the time of the trouble. Before she went to the store she was advised that appellants no longer wanted her patronage and were displeased with her complaint, which they believed, and which the evidence overwhelmingly shows, was a groundless one, and had she any desire to avoid the altercation, she would have quietly returned the fish, taken her money and departed; instead of which she showed a decidedly defiant and aggressive attitude and, we think, provoked what followed. It may be that appellant Pavlik was not as polite and considerate as he should have been, but that did not justify respondent in provoking the altercation in the presence of appellants' customers and pursuing the matter to the point where her forcible ejection seemed the only course left open. The warning in advance that she was no longer desired as a customer was a withdrawal of the general invitation which she, in common with the public, theretofore had to enter appellants' place of business, and she came on the limited invitation to return the fish and receive back her money. Her own testimony shows that, if she had then departed, as she should have done, she would have suffered nothing beyond a little rudeness and lack of consideration, which would not have been actionable. We think this rudeness did not warrant respondent in remaining in appellants' place of business, knowing that her invitation had been withdrawn, and there attempting to justify herself in the manner shown.

The law is well settled that the proprietor of a place of business to which the public is invited generally, may request one making a disturbance to leave, and, upon noncompliance, may use such force as is necessary to eject the disturber. *Howell v. Winters*, 58 Wash. 436, 108 Pac. 1077; *Austin v. Metropolitan Life Ins. Co.*, 106 Wash. 371, 180 Pac. 134.

The facts here shown would have justified such an ejection.

The judgment is reversed, with directions to dismiss the action.

HOLCOMB, C. J., FULLERTON, BRIDGES, and MOUNT, JJ., concur.