12626

STATE v. MARTIN

(147 S. E., 606)

466

470

472

*Mr. P. H. McEachin* for appellant,

*Solicitor L. M. Gasque,* and *Mr. P. H. Arrowsmith,* for respondent.

April 2, 1929.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

The defendant, A. M. Martin, was indicted and tried in the Court of general sessions for Florence County for the murder of J. B. Muldrow, and, having been convicted of manslaughter, was sentenced by the Court to imprisonment for a period of five to ten years. From the verdict rendered and sentence imposed, the defendant has appealed to this Court, and asks a reversal of the lower Court upon the grounds set forth in the several exceptions, all of which impute error to the presiding Judge, Hon. S. W. G. Shipp, in his charge to the jury.

The deceased, a resident of Florence County, was a man of about 53 years of age, and the defendant at the time of the homicide was 55 years of age, having a wife and five children, and resided at Effingham in Florence County, on the plantation of Henry McCall, near the scene of the homicide. The defendant had been engaged principally in saw-milling, though the year prior to this occasion he had farmed for Mr. McCall. The unfortunate affair grew out of a controversy concerning the purchase of an engine and boiler by the defendant from the deceased. According to the testimony on behalf of the defendant, which is corroborated in part by witnesses for the State, the following are the facts leading up to the killing: About three months prior to the homicide,

which occurred March 31, 1927, the defendant purchased from the deceased an engine and boiler, to be used as a part of a sawmill plant which the defendant erected on lands rented from Mr. L. E. Ward, near defendant's home. The machinery purchased by the defendant for the erection of the sawmill was secondhand machinery, and the most of it was in bad condition, and had to be repaired. This was especially true of that purchased from the deceased. The flues of the boiler were in very bad condition; it had no pipes, valves, or gauge. With the help of his boys, the defendant overhauled the machinery purchased from the deceased, and put it in running condition after working on it for some time and at a considerable cost. Under the agreement between the parties as to the purchase of this machinery, which agreement was by parol, the defendant was to pay the deceased for the same the sum of $150, payable $10 per month, the first installment of $10 to be paid the 1st day of April, and $10 to be paid on the 1st day of each month thereafter until the balance was paid. It appears that the parties had in mind that some time would be required for repairing and installing the machinery, and it was agreed, according to the testimony of the defendant, that the defendant should operate the machinery one month after the same was ready for operation before any payment should be required, and under this agreement the first installment did not fall due until the day following the date of the killing, the defendant having commenced the operation of the machinery the 1st day of March. The deceased, Mr. Muldrow, represented to the defendant, at the time of the agreement of sale, that there were no papers over the machinery. The defendant testified that, while he had been operating the mill about 30 days, he had not been able to cut much lumber on account of the fact that the woods were wet.

Mr. Muldrow went to see Mr. Martin on the 21st or 22d of March, accompanied by Mr. Garland and Mr. Bryant, though these gentlemen, Mr. Garland and Mr. Bryant, were

some distance away during the conversation that took place, and, it appears, did not hear the conversation that took place between Mr. Muldrow and Mr. Martin concerning this machinery. According to Mr. Martin's testimony, Mr. Muldrow told Mr. Martin on that occasion that the engine and boiler belonged to Mr. Bryant, and that Mr. Bryant had gotten in behind him (Mr. Muldrow) for selling the same, and wanted to know if Mr. Martin had not used it long enough to pay him for the repairs, whereupon Mr. Martin told Mr. Muldrow that he had not. It further appears that the repairs on the engine and boiler made by Mr. Martin amounted to $65.05, and, in addition, he owed the Schofield Hardware Company for material for use in this machinery the sum of $14.35. Mr. Muldrow asked Mr. Martin to let him have the machinery back in order to keep him out of trouble, and stated that, if Mr. Martin would let him have it back, he would pay for all the repairs, and stated that he would bring the money to Mr. Martin the following day. Whereupon Mr. Martin agreed to let Mr. Muldrow have this machinery, the engine and boiler, upon receipt of the sum of $65.05, stating, "I was not to turn the boiler over until Sixty-five Dollars and five cents was paid to me. The use of the boiler up to this time was to go for the labor of repairing it and Muldrow was to pay me for the cost of parts and material." The defendant further stated, "I saw Muldrow again on Saturday after that, at Sam Mathews' store. I said to him. 'I did not see you.' He said, 'No, something was the matter.' I told him then, 'There ain't nobody going to move that mill until I get my money.' He said he would do what was right that when he came for it, he would bring the money. Didn't see Muldrow any more before Bryant came on Thursday. When Bryant came I said, 'Where is Muldrow?' He said, 'I haven't seen him since I was here the other day.' I said, 'Ain't nobody going to move the boiler until I get the repair bill.' Muldrow agreed to pay me for the repair bill. He said, 'It has been a lot of trouble to me.' I said, 'It show has to me, and I wish I had never

seen it.' He said, 'What were you to give for it?' I said, '150.00.' He said, 'Are you in shape to pay for it to-day?' I said, 'I reckson so.' I said, 'Let's go to Mr. McCall's and see if I can get him to help me pay for it.' We walked off and went forty or fifty steps and he said, 'I don't think it is right to lose $5.00 I put in the wheels.' I said, 'I don't think so either.' He said, 'This ain't my job, let me go get Muldrow.' I took the wheels out of the truck and he went to see Mr. Muldrow, and I went to see Mr. McCall. When Bryant said it wasn't right for him to lose $5.00 for fixing the wheels I agreed to pay it to him. I agreed to pay him in all $155.00 for the boiler. On the way to Mr. McCall's I met Henry Worrell and consulted him. I went to see Mr. McCall to arrange to get him to pay for the boiler for me. I saw Mr. McCall and he said if they could make good title for it, he would pay for it and to bring both of them up there. I went back to the mill and Mr. Garland, Mr. Bryant, Mr. Muldrow and Mr. Polson were there; they had taken the belt off, had pulled out the fire and were pouring water on it. Mr. Muldrow says, 'I am come to move it.' I said, 'I made arrangements with Mr. McCall to pay for it.' I said, 'Mr. Bryant, I can pay you $155.00.' Mr. Bryant said it seemed to him the right thing. Muldrow said, 'I have come to move it and I am going to move it.' Muldrow started to walk down to the lower end of the carriage track next to the railroad. He was hunting something like to make a prize with. I said, 'Mr. Muldrow, let's get in trouble.' He said, 'Dam it, he was hunting trouble.' He said he was going to move it and he said, 'If you fool around here, me or you is going to bust hell wide open,' and then he changed his pistol in his pockets. He took his pistol out of his coat pocket and put it into his right back hip pocket. In the first of this conversation Muldrow asked me if I hadn't sawed enough to pay for the boiler. I said, 'Here's the book taken it and see.' He said, 'Dam that, he didn't have to look at that.' He was going to get it. When I went home and

came back, he was there stooping down when I got pretty close. I said, 'Now leave that thing alone.' He throwed his hand back and got hold of his pistol and I shot him. When I shot him, he was standing up with his hand on his pistol. I went home after the shooting.

"Why did you shoot Mr. Muldrow? A. To keep him from shooting me.

"Q. Were you on your own premises? A. Yes, sir.

"Q. At your own saw mill? A. Yes, sir. I came to the saw mill from home with the gun, along a little foot path across the field. When I was coming across the field to the boiler, I couldn't see Mr. Muldrow until he raised up. He stepped out this side of the wheel at the fire box. I was then in about thirty feet of him. He didn't say anything. When I left the mill to go to Mr. McCall's that morning, I had been sawing. The boiler was fired up and one of the darkies working for me was throwing slabs and the other was pushing sawdust out. I stopped sawing. I thought I had better look after it. I would rather pay for it than to lose it or have any trouble. When I walked up to the mill and stopped, my gun was down in my hand; I didn't put the gun to my shoulder until Mr. Muldrow raised up and put his hand on his pistol by the barrel. I had been in possession of the premises here. I had the saw mill ever since about the 10th of January. I had possession before I moved there. I made a trade with Mr. Ward and up to the time of the shooting, had paid him some rent. I had sawed several thousand feet of lumber for Mr. Ward. When Muldrow came to take the boiler away, I had paid everything except a part of Schofield Hardware Company's bill. I had no money at all. The boiler is now in my possession upon the same premises. Mr. Bryant has never come with a mortgage or claim and delivery to take it. It is my boiler. I told Muldrow when he came there, he could get it if he paid me; Mr. Bryant told Muldrow that it would be the best way to let me pay for it. I didn't sell lumber at the mill. Only sawed for people who brought trees.    *    *    *

"Q. Why did you go home to get your gun? A. I thought he would go off and leave it alone, or possibly take the money for it.

"Q. Did you intend, when you went home, to get your gun to come back and shoot Muldrow? A. No, sir.

"Q. Would you have shot Muldrow if he hadn't reached for his gun? A. No, sir. I went home for the gun, straight across the field took a path that I used in going and coming from my home to the mill. I went by McLaughlin's store while going home and bought the shells. I bought No. 4 shot, that was the largest they had. Muldrow was shot on March 31st, and the first payment on the boiler was due on April 1, 1927."

This testimony by the defendant was given on the direct examination, and, while a lengthy cross examination followed, we have failed to observe any material change in the testimony elicited on the cross examination from that given under the direct examination.

Mr. Henry McCall, witness for the defendant, on whose plantation the defendant resided, testified that the defendant made arrangement with him to pay the amount claimed to be owing on the machinery for the purpose of enabling the defendant to keep the machinery, and that he promised to furnish the money for the defendant, provided the title to the same was good.

L. E. Ward, witness for the defendant, testified that he rented to the defendant the sawmill site and surrounding premises where the mill was located; and also testified as to the very bad condition of the boiler when the defendant purchased it from Mr. Muldrow, stating that he helped Martin to move it from Mr. Muldrow's place; and further testified that Mr. Martin worked on the boiler "off and on for about two months; he had to put in flues and pipe fittings; pipes and steam gauge, and those things it takes to operate a boiler with; wasn't anything on it at all. The boiler was on Muldrow's plantation beside the road, out in the weather when we got it."

The transcript contains the following statement of the testimony of W. D. McElveen, witness for the defendant:

"Lives on Mr. McCall's place at Effingham; was working for Mr. Ward on the day Muldrow was killed; was hauling lumber that day, unloading lumber; I went to the mill that day about one o'clock, found Mr. Muldrow, two more white men and two colored fellows that worked for Mr. Martin; they were jacking up the boiler and putting the wheels on it; Mr. Muldrow, the two white fellows and the two colored fellows were helping; the fire had been taken out the boiler and they were putting on the next to the last wheel. I went back to the new house and went to unloading lumber; I knew it wasn't any use hauling any more logs, as they were taking up the mill. The new house is about one hundred forty yards from the mill; it is perfectly open from the new house to the mill; after I had been to the new house about twenty-five minutes unloading lumber, I saw Mr. Martin coming across the field with a gun in his hand. He was about the same distance from the mill as I was when I first saw him; he was in the field going towards the mill; after I saw Martin going across the field to the mill, I heard somebody call twice. After the call, two men left the mill, a colored man and a white man; one come to the truck and one got on the mule. When the white man got to the truck, Martin was about the edge of the field; about seventy-five yards from the mill, walking towards the mill; I saw Muldrow; he was stooping over like putting on the wheel; the right hand front wheel on the fire box end of the boiler; the rear wheel on the right side of the boiler; I saw Martin walk up to the mill; just before Martin got to the mill, Muldrow raised up. Martin stopped on the right hand side away from where I was. He had his gun down in his hand. He stopped about one half minute or a minute before he shot; when Martin walked up and stopped, Muldrow was standing up; when Martin stopped Muldrow threw his hand to his hip pocket; Martin throwed up and shot; I could not hear from where I was, whether Martin said anything or not."

## CROSS EXAMINATION

"Martin walked up. Mr. Black (meaning Black Muldrow, the deceased) was stooping down putting on a wheel. Martin said something. Mr. Black raised up as soon as Mr. Martin said something to him, Mr. Black threw his hand to his hip pocket, and as he did, Mr. Martin threw his gun up and shot him."

Several witnesses testified to Mr. Muldrow's having a pistol. Mr. Ward, in the course of his testimony concerning the pistol, stated, "the first thing I did, I walked up and saw who it was and walked up behind Mr. Muldrow and the first thing I saw was a pistol in his pocket, and his coat thrown clear of the pistol and on this pistol was 'Smith & Wesson, 38 Special.' "

Mr. J. A. Muldrow, a brother of the deceased, witness for the State, in the course of his testimony stated:

"Q. Was your brother in the habit of carrying a pistol? A. Yes, sir.

"Q. Is that the pistol he carried? A. Never saw it before in my life. He was an habitual pistol carrier. He lived in the West a good while, and got in the habit of carrying one."

The testimony introduced on the part of the State differs on some material points from that offered by the defense, especially with reference to what took place immediately before the defendant fired. The State contended that the deceased made no effort to shoot or harm the defendant in any way, and that the defendant shot the deceased without any warning. There was some testimony tending to sustain this contention, but, since for the purpose of considering appellant's exceptions the testimony must be viewed in the most favorable light for appellant, it would serve no useful purpose to state at length the testimony relied on by the prosecution. But it clearly appears from the testimony of the witnesses for the State, as well as by the witness on the part of the defendant, that the defendant had purchased the engine and boiler in question from the deceased; that the defend-

ant had installed the same as a part of his sawmill plant for the manufacture of lumber on land rented by him from Mr. Ward; that he was in possession of the same, and was actually operating the plant, on the day of the killing, and had up steam for the purpose of operating, when the deceased with his men arrived on the scene; that the defendant told the deceased he could not move the machinery without first paying the defendant for the repairs the defendant had made, and, further, he offered to pay to the deceased the balance owing on his obligation to the deceased for the machinery; and Mr. Bryant, a witness for the State, who Mr. Muldrow said claimed the machinery in question, tried to get Mr. Muldrow to accept from the defendant the amount owing on the same, but the deceased refused to do this, and also refused to pay Mr. Martin the cost for the repairs, and proceeded to dismantle the boiler for the purpose of taking the same from the possession of the defendant and carrying it away; and Mr. Muldrow, the deceased, personally took the fire out of the boiler, and personally did a number of other acts in dismantling the machinery preparatory to taking it out of the possession of the defendant and carrying it away.

As stated, all of the exceptions impute error to his Honor, the presiding Judge, in his instruction to the jury, and under our view of the case it is only necessary to consider the fifth, sixth, ninth, and eleventh exceptions, which may be considered together, to wit:

"V. That his Honor erred in refusing defendant's eighth Request to Charge: 'If the jury find that the defendant was in lawful possession of the boiler and deceased began taking it away, after defendant had objected to such taking away that defendant had a right to use such force as was necessary to prevent the taking away of the boiler and if resisted by force, he may legally defend himself and repel force by force, using such force as the nature of the attack may render necessary to defend himself.

"VI. That his Honor erred in charging the jury, while commenting upon the eighth Request to Charge. 'I charge

you now, Mr. Foreman, that he can do that only in case a felony was being committed.' It being respectfully submitted that defendant had a right at his place of business, factory or workshop, to use such reasonable force, short of killing or serious bodily harm, as was necessary to prevent the taking away of his property.

"IX. That his Honor erred in charging the jury that the defendant only had the right to use force where a felony was being committed.

"XI. That the whole charge of his Honor was prejudicial in that it gave the defendant no right upon his own premises and at his factory, workshop, or place of business, to use reasonable force, short of killing or serious bodily harm, to eject deceased or prevent the taking away of defendant's property."

By reference to his Honor's charge, which will be incorporated in the report of the case, it will be observed that his Honor instructed the jury as to the law of the domicile and the curtilage surrounding it, and explained to the jury what rights the owner or one in possession thereof has, and what force can be used in ejecting a trespasser therefrom. His Honor also instructed the jury as to the law of a mere trespass on other parts of one's premises. But, under our view of his Honors' charge, his Honor did not fully charge the law peculiarly applicable to the particular facts of this case to which the defendant was entitled. In the course of his charge, his Honor referred to the decision of this Court in the case of the *State v. Bradley*, 126 S. C., 528, 120 S. E., 240, as being opposed to the defendant's view of the law, and read therefrom the following language (quoting from syllabus) :

"The right of occupant to expel a trespasser and to use such force as is necessary, even to killing him, is limited to the place of his habitation or perhaps of his curtilage, and does not apply to other parts of occupant's premises."

This Court adheres to that statement as being a correct statement of the law, and applicable to the facts of the *Bradley case,* but that the same should not be construed as being opposed to the well-settled rule that a man's place of business, his office, his workshop, or factory falls within the meaning of his "domicile" for the purpose of protecting the same and the property therein and ejecting a trespasser therefrom, under certain conditions. For instance, the general public have an implied license to enter a retail store, and, perhaps, many other places of business, but one in charge of such place of business has the privilege and right to revoke such license at any time he sees fit as to any person, and to eject such person if he refuses to leave when directed or requested to do so, and for this purpose the proprietor has the right to use such force as is necessary under the circumstances of the particular case. The same rule also applies to a workshop or factory; that is, those that hold out an implied license to enter. Of course, not all workshops or factories are open to the public, and in such places a person has no right to enter without an invitation. Whether the person enters such place of business, be it store, workshop, or factory, under an implied license, by invitation or without an invitation, it is the duty of such person to leave when requested to do so, and, refusing or failing to comply with the request or notice to leave such person becomes a trespasser, and the proprietor of the place has the right to use such force, short of killing him, as is necessary to eject such trespasser, and, also, whether requested to leave or not, to use such force as may be necessary, short of killing him, to prevent the trespasser from taking and carrying away property contained in such place of business in the rightful possession of the proprietor, whether the trespasser acts under claim of right or not in attempting to take and carry away such property from such pace of business, and, if resisted by force, the owner, proprietor, or one in charge of said place may legally defend himself, and for this purpose use such force as the nature of the attack and the surrounding circumstances re-

quire. (Of course, what is said herein has no reference to a person clothed with a warrant under the law.)

In the case at bar, the defendant relied on the right of self-defense, and the right to protect his property, which was rightfully in the defendant's possession, and constituted a part of his sawmill plant, in operation at the time, a very important part of his case, in that such right would absolve him from being at fault in bringing on the difficulty and from having to comply with the law of retreat. His Honor, the presiding Judge, in his charge to the jury, absolved the defendant from the duty of retreat, because of being on his own premises, but failed, according to our view, to give the jury clear instruction as to the defendant's right to protect this property, which failure, from our view of the case, very likely caused the jury to reach the conclusion that the defendant was at fault in bringing on the difficulty. While in the course of his general charge his Honor stated to the jury that, if the property was in the actual possession of the defendant, and some one came to take it, he had the right to protest against it and use reasonable force to prevent the person taking it from him, in our opinion the instruction did not go far enough. His Honor failed to instruct the jury that the defendant could use such reasonable force, short of killing the person, as might be necessary to protect the property and prevent the person taking the property and carrying it away, and that if, in the exercise of such right, the defendant was assaulted by such person, the defendant would have the right to legally defend himself, repel force by force, and use such force as the nature of the attack and circumstances required, even to the extent of taking life of such person, if necessary to save his own life or protect himself from serious bodily harm, for under such circumstances, the defendant would be without fault in bringing on the difficulty, and would not be required to retreat, but could stand his ground.

A study of his Honor's charge leads us to the conclusion that the jury was not sufficiently instructed along the line indicated above, and because of this the jury very likely reached

the conclusion that the act committed by the deceased in entering the factory, sawmill plant, of the defendant, of which the defendant was in rightful possession, and proceeding to dismantle the same for the purpose of taking it from the defendant, over the protest of the defendant, constituted a mere, trespass, and that the defendant was not clothed with any of the rights given under the law in defense of the domicile, except that he was not bound to retreat, leaving the jury to infer that the defendant was not without fault in bringing on the difficulty, which practically destroyed his plea of self-defense. We therefore think that the defendant is entitled to a new trial.

In support of the views herein expressed, we call attention to the following authorities: *Davis v. Whitridge,* 2 Strob., 232; *State v. Bodie,* 33 S. C., 128, 11 S. E., 624; *State v. Gordon,* 128 S. C., 426, 122 S. E., 501; *State v. Rochester,* 72 S. C., 194, 51 S. E., 685; *State v. Rogers,* 130 S. C., 433, 126 S. E., 329; *State v. Bowers,* 122 S. C., 279, 115 S. E., 303; *Crouch v. Ringer,* 110 Wash., 612, 188 P., 782, 9 A. L. R., 379; 2 R. C. L., 557; *State v. Laura,* 93 W. Va., 250, 116 S. E., 251; *State v. Goode,* 130 N. C., 651, 41 S. E., 3; *State v. Crook,* 133 N. C., 672, 45 S. E., 564; *State v. Terrell,* 55 Utah, 314, 186 P., 108, 25 A. L. R., 497; *Annotation,* 25 A. L. R., 537.

Under the annotation under the case of *State v. Terrell,* 25 A. L. R., 537, we find this statement of the law:

"Since the rules of law governing the liability of the owner of property for an assault in defending it against aggression are applicable alike to a civil action for damages and a criminal prosecution, no attempt has been made to separate the civil and criminal cases. They may, however, be readily distinguished, when so desired, by the style of the case.

"As an incident to the right to acquire and own property, recognized by the laws of all civilized communities, the owner has the right to defend and protect it against aggression, and if he commits an assault in so doing the law will

justify him. Blackstone says: 'In defense of my goods or possession, if a man endeavors to deprive me of them, I may justify laying hands upon him to prevent him; and in case he persists with violence, I may proceed to beat him away. * * * And, if sued for this or the like battery, he may set forth the whole case, and plead that he laid hands upon him gently, molliter manus imposuit, for this purpose.' 3 Bl. Com., 120. This doctrine finds universal support in the adjudicated cases, from which may be deduced the general rule that a person in possession of property, either as owner, or as the agent or servant of the owner, may justify a charge of assault and battery by proving that, in defense of the property, and to protect it from threatened and impending injury or destruction at the hands of the person assaulted, he used such force as was necessary, and no more than was necessary, to prevent the injury or loss."

In support of this statement of the law, the editor of the annotation cites, among other cases, a South Carolina case, *Davis v. Whitridge* (1847), 33 S. C. L. (2 Strob.), 232, in which case Mr. Justice Evans, speaking for the Court, in discussing the general law applicable to questions involved in the case at bar, said:

"If one unlawfully attempt to dispossess another of his property, he may be repelled with such force as is necessary to maintain possession. This is the law of self-defense which is recognized only in those cases where, if one were compelled to resort to the slow process of the law, the injury would be irreparable. Where the possession is in another, the owner may take possession, if he can do so without tumult or riot, or breach of the peace. If this cannot be done, he must resort to the law. Any other doctrine would resolve every disputed right into a question of power: The strong would always prevail over the weak. In this case, the sufficiency of the defendant's plea depends upon this: Did he have possession, and did he do no more than was necessary to maintain that possession?"

In the recent case of the *State v. Bowers et al., supra,* this Court held that the following request to charge stated a correct proposition of law, and remanded the case for a new trial because of the presiding Judge having refused to charge the same, to wit:

"One who is assaulted in his own house is not required to retreat before exercising his right of self-defense, and I charge you that a man's place of business is within the meaning of this rule and is deemed his dwelling, and he need not retreat therefrom in order to invoke the benefit of the doctrine of self-defense."

In the case of *State v. Rogers, supra,* Mr. Justice Marion, speaking for this Court, in his discussion of the rights of a proprietor to expel a trespasser, made this statement of the law:

"It may be proper to add in this connection, however, that the foregoing conclusion is not to be understood as a declaration that the proprietor of a place of business, such as a store, shop, office, etc., has no right to eject one who, either by virtue of a warning before entry, or as a result of a duly communicated revocation after entry of an express or implied license to enter has become a trespasser. That such a proprietor has the right to eject a trespasser from his premises and to use such reasonable force, short of killing him, as may be necessary to accomplish the expulsion, is, as we apprehend, well settled. See note and collation of authorities, 9 A. L. R., 379-382. If, in the exercise of that right, the proprietor is assaulted by the trespasser and subjected to such danger of life or of serious bodily harm as would justify the killing of the assailant under the law of self-defense, obviously he would have the right to stand on that defense and, if, in fact, engaged in the legitimate exercise in good faith of his right to eject, he would in such case be without fault in bringing on the difficulty, and would not be bound to retreat."

It is the order of this Court that the judgment of the Circuit Court be, and is hereby, reversed, and the case remanded for a new trial.

MR. CHIEF JUSTICE WATTS concurs. MR. JUSTICE STABLER concurs in result.

MR. JUSTICE COTHRAN (dissenting) : I do not think that the law which defines the right of the occupant of premises, whether his domicile, the curtilage, or his place of business, to eject a trespasser therefrom, has any application to the facts of this case, for the reason that there is no evidence, even from the defendant, that he was attempting to exercise that right.

In the printed brief of counsel for the appellant it is said:

"* * * The defense was solely self-defense and the right to protect property being taken under claim of right, or to eject a trespasser from a place of business, while of primary importance to the appellant in sustaining the first element of self-defense, i. e., without fault in bringing on the difficulty, was not offered as justification for the tragedy."

As there was no evidence of any effort on the part of the defendant to eject the deceased from the premises, this feature of the statement made by counsel may be eliminated; what remains may be accepted as a correct statement of the defendant's position, in substance, that the sole defense of the defendant was self-defense, and his right to protect property in his possession and his conduct in the alleged enforcement of that right bear only upon the single element of his plea of self-defense, that he was without fault in bringing on the difficulty.

The defendant assumed the burden of establishing the four well-known elements of self-defense; one of which is that he was without fault in bringing on the difficulty. He sought to bear this burden by showing that his possession of the personal property was being invaded by the deceased unlawfully, and that, acting in the exercise of his right to employ reasonable means to prevent such unlawful invasion, he necessarily was not at fault in bringing on the difficulty; hence he had established that essential element in his plea.

I think that his Honor the Circuit Judge, most careful as he is in all instances to guard the rights of the defendant, gave him the full benefit of this right in the following language:

"If you make reasonable protest against the trespass and he commits an assault upon you, you have the right to defend yourself; *if you are making a reasonable defense of your property and you are assaulted, you have a right to defend yourself.* The only right of defense of property of (in?) taking human life is where a felony is committed. You have no right to take human life in order to prevent a mere trespass, but if in trying to make reasonable efforts to prevent the trespass an attack is made on you, you have the right to defend yourself."

The defendant in establishing this element of his plea must not only have shown that his possession was being unlawfully invaded, but that he was using reasonable means to prevent it. Under the evidence in the case, the jury may rightfully have concluded that the defendant did not comply with this obligation. It tended to show that he was angrily determined that the deceased should not remove the boiler and to prevent it at any cost. A witness testified that, after the dispute arose, the deceased expressing his determination to move the boiler and the defendant vigorously opposed thereto, the defendant moved off toward his home saying, *"I will show you, you can't get it."* Another, that he said "You will not move it; you *just stay here until I get back."* The defendant admitted saying, "There ain't nobody going to move that mill until I get my money." By his own testimony it appears that he walked over the fields toward his home; secured his shotgun, stopped at a store, and bought shells loaded with No. 4 shot, *"that was the largest they had."* (He doubtless would have bought buckshot shell if they had been available.) The evidence tends to show that he returned to the mill, stood some 10 or 15 feet from the deceased, announced, "You can do your dirt, but you can't

get away with it," and shot him to death while he was kneeling on one knee near the boiler.

Even if there was an omission on the part of the presiding Judge to charge more fully (which I do not think existed), the evidence fails to show that the defendant was using reasonable meants to protect his property; and that therefore he utterly failed to establish the essential element that he was free from fault in bringing on the difficulty.

It is true that the defendant claimed that, as he stood before the deceased, shotgun in hand, the deceased made a movement for his pistol, and then shot in self-defense. This, if true, would not avail him, if he himself was at fault in bringing on the difficulty.

His Honor most forcibly and justly charged the jury:

"A person has no right to assault another merely to protect property, unless he is in possession, and the killing is necessary in order to prevent the commission of a felony. The reason is that the preservation of human life is of more importance than the protection of property. The law may afford ample indemnity for the loss of property, while it has utterly failed to do so as to the other."

It must be remembered, as counsel for the defendant concedes, that the defendant does not attempt to justify the killing as having been done in defense of his possession of the personal property; he relies solely upon his plea of self-defense; the other being incidental as shown.

In this case it appears to me that the presiding Judge fully charged the jury upon the defendant's plea of self-defense and upon his right to use reasonable means to protect his property. I think that he has nothing to complain of, and that the judgment should be affirmed.

Mr. Justice Blease concurs.